IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Nina Scarlett Webb, | ) | C/A No.: 1:14-4838-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

    A.    Procedural History

On November 28, 2011, Plaintiff protectively filed an application for DIB in which she alleged her disability began on April 1, 2009. Tr. at 70, 124–25. Her application was denied initially and upon reconsideration. Tr. at 80–84, 86–87. On May 15, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Carl B.

Watson. Tr. at 24–46 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 9, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–23. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 23, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 46 years old at the time of the hearing. Tr. at 70. She completed high school and obtained an associate's degree in criminal justice. Tr. at 312. Her past relevant work ("PRW") was as a secretary, an administrative assistant, and a paralegal. Tr. at 42–43. She alleges she has been unable to work since April 1, 2009. Tr. at 70.

2.    Medical History

On April 1, 2009, three days after giving birth to her fourth child, Plaintiff went into cardiac arrest. Tr. at 209–10. She was hospitalized at Trident Medical Center from April 1 to April 13, 2009. Tr. at 215. Her discharge diagnoses included anoxic brain injury, status post cardiac arrest; postpartum cardiomyopathy; and possible aspiration pneumonia. *Id.* The discharge summary indicates Plaintiff was without oxygen for approximately three minutes. Tr. at 216. She was initially slow to respond to commands, but she became more alert and cooperative on April 10, 2009. *Id.* Upon discharge, Plaintiff had not returned to her baseline mental status, and the physicians noted that she did not have adequate short-term memory and occasionally made inappropriate

2

comments. *Id.* They indicated Plaintiff's judgment was impaired and that she should not be left unattended. Tr. at 217. Plaintiff was referred to Healthsouth for outpatient physical, cognitive, and occupational therapy. Tr. at 216.

On April 29, 2009, Plaintiff spoke with Linda Hair, M.A., in her physician's office. Tr. at 290. She reported she was doing well, but that she was unable to remember events that occurred after her baby shower. *Id.*

Plaintiff followed up with cardiologist Laurance Farmer, M.D. ("Dr. Farmer"), on May 4, 2009. Tr. at 266–68. She reported she was participating in physical therapy and had only experienced minor fatigue since being discharged from the hospital. Tr. at 266. She indicated her cognitive and motor functions were improving. *Id.* Dr. Farmer stated Plaintiff was doing well clinically and that she had a normal ejection fraction. Tr. at 267. He indicated Plaintiff had an excellent overall prognosis and should have no limitations in her activity. Tr. at 267–68. He further specified that Plaintiff's neurological recovery had been good and that there was no reason for her not to drive. Tr. at 268.

Plaintiff presented to Moncks Corner Medical Center with neck and back pain on May 18, 2009. Tr. at 348, 351. She reported she was injured when a wave slammed her into the seat of a boat. Tr. at 351. She had a mild muscle spasm on the right and mild soft tissue tenderness in the right middle and lower lumbar areas of her back. Tr. at 349. She was diagnosed with pericervical and perilumbar strain or sprain with muscle spasm and prescribed Lortab and Flexeril. *Id.*

Plaintiff next presented to the emergency room ("ER") at Moncks Corner Medical Center on June 14, 2009, with complaints of dysuria and pain in her pelvis and lower

back. Tr. at 358. She was diagnosed with an acute urinary tract infection ("UTI"). Tr. at 360. On June 16, 2009, Plaintiff returned to Moncks Corner Medical Center with a complaint of chest pain. Tr. at 363. She was diagnosed with atypical chest pain and costochondritis. Tr. at 367. She was instructed to rest, to avoid strenuous activity and stimulants, to follow a low fat and low sodium diet, to drink only clear liquids, and to avoid smoking. *Id.*

Plaintiff presented to Moncks Corner Medical Center on August 5, 2009, with complaints of pain in her chest and left axilla. Tr. at 376. Her pain decreased while she was in the ER. Tr. at 377. She next presented to the ER at Moncks Corner Medical Center on September 6, 2009, with an acute cervical strain. Tr. at 378–79. She indicated she had injured her neck while riding in a boat one day earlier. Tr. at 381. The provider noted Plaintiff had moderate muscle spasm of the right posterior neck, decreased range of motion ("ROM"), and soft tissue tenderness. Tr. at 650. He diagnosed an acute cervical strain and instructed Plaintiff to apply ice intermittently. *Id.* He prescribed Lortab and Flexeril. Tr. at 651.

On September 11, 2009, Plaintiff contacted her physician's office to request a prescription for Fioricet. Tr. at 286. She indicated she had experienced headaches since giving birth to her fourth child. *Id.* She stated she had forgotten her postpartum appointments and was tearful about her memory problems. *Id.*

On November 1, 2009, Plaintiff presented to Moncks Corner Medical Center complaining of an injury to her left arm and a muscle spasm. Tr. at 383. She received prescriptions for Lortab and Flexeril. Tr. at 385.

4

Plaintiff next visited the ER at Moncks Corner Medical Center on December 31, 2009, with complaints of neck and back pain. Tr. at 400. She indicated she was injured while riding in her 18-year-old daughter's new all-terrain vehicle ("ATV"). *Id.* The physician's clinical impressions included lumbar strain, acute right-sided lumbar radiculopathy, acute cervical strain, acute right-sided sacroilitis, acute UTI with cystitis, off-road vehicle accident, sinus tachycardia, and possible herniated disc. Tr. at 402.

On January 28, 2010, Plaintiff presented to Elizabeth N. Dacus, M.D. ("Dr. Dacus"), with complaints of pain during urination and intercourse, headaches, and difficulty holding her bladder. Tr. at 279. Dr. Dacus indicated Plaintiff had required extensive rehab and had not been able to drive or to care for her child without supervision until two weeks prior to her visit. *Id.* Plaintiff indicated she was experiencing significant anxiety and emotional stress. *Id.* Dr. Dacus noted that Plaintiff's judgment and insight seemed mildly impaired and that she was depressed. Tr. at 283. She assessed candidiasis of the vulva and vagina, post-traumatic stress disorder ("PTSD"), and pelvic pain. Tr. at 284. She prescribed Diflucan for candidiasis and Fioricet for headaches and referred Plaintiff for a pelvic ultrasound and a psychological consultation. *Id.*

Plaintiff presented to the ER at Trident Medical Center on February 8, 2010, with complaints of pain and injury to her back. Tr. at 469. She stated she was injured in an ATV accident two weeks earlier and that she recent slipped and fell on icy steps. Tr. at 471–72. The provider observed soft tissue tenderness and limited ROM in Plaintiff's back. Tr. at 470. His clinical impressions were lumbar radiculopathy and lumbar strain. *Id.* He prescribed Flexeril and Ultracet. *Id.*

5

Plaintiff presented to Pamela S. Williams, LISW-CP ("Ms. Williams"), at the Medical University of South Carolina's Institute of Psychiatry on February 16, 2010. Tr. at 310–13. She reported symptoms that included depressed mood, sleep disturbance, crying spells, reduced self-confidence, loss of identity, anxiety related to memory problems, anxiety about going anywhere alone or being around crowds, and low self-esteem. Tr. at 310. Plaintiff continued to report that she did not remember anything from the month before she delivered her son. *Id.* She indicated that she had resumed driving and caring for her children. *Id.* She reported residual memory problems and anxiety provoked by visits to the grocery store and hairstylist and by shopping alone. Tr. at 311. Plaintiff stated she wanted to be active, confident, and social and to possibly return to work. Tr. at 311–12. Ms. Williams observed Plaintiff to be dressed appropriately; to be cooperative and to maintain good eye contact; to have normal motor function; to be alert and fully oriented; to have a cooperative attitude; to demonstrate normal speech; to have a depressed mood; to show a full range of affect; to have goal-directed and coherent thought processes and appropriate thought content; to have normal judgment and insight; to demonstrate no signs of hallucinations; and to express no suicidal or homicidal ideations. Tr. at 312. She recommended Plaintiff participate in individual and family therapy and receive medication management. Tr. at 313.

Plaintiff presented to Moncks Corner Medical Center on May 2, 2010, with complaints of severe right lower lumbar pain and a brief period of leg numbness. Tr. at 406. She was diagnosed with an acute lumbar strain and instructed to limit her lifting and

to avoid strenuous activities. Tr. at 407. She received prescriptions for Lortab and Valium. Tr. at 408.

Plaintiff next presented to the ER at Moncks Corner Medical Center on May 20, 2010, with complaints of wheezing. Tr. at 411. She was diagnosed with acute bronchitis and a migraine headache. Tr. at 415. She returned to the ER on May 23, 2010, with complaints of cough, fever, and chills. Tr. at 419. Plaintiff was diagnosed with pneumonia and dehydration. Tr. at 420–21.

On July 18, 2010, Plaintiff presented to the ER at Moncks Corner Medical Center with a complaint of chronic back pain. Tr. at 425. She indicated she was injured when the boat she was riding in was jolted by waves. *Id.* Plaintiff had moderate soft tissue tenderness in her lower lumbar spine, but she demonstrated normal ROM, no muscle spasm, and no sensory or motor deficits. Tr. at 426. Plaintiff was diagnosed with an acute lumbar sprain and received prescriptions for Lortab and Flexeril. *Id.*

Plaintiff visited Moncks Corner Medical Center on September 8, 2010, with complaints of upper extremity pain. Tr. at 430. She indicated she was injured when she attempted to restrain her child, who was lunging from her arms. *Id.* The provider's impressions were left shoulder strain, acute pain in the left upper extremity, paresthesia, and myofascial strain. Tr. at 432. Plaintiff was instructed to apply ice to her shoulder and to wear a sling. *Id.* She received prescriptions for Lortab and Ativan. *Id.*

On September 18, 2010, Plaintiff presented to Moncks Corner Medical Center with dysuria. Tr. at 435. The provider noted that Plaintiff had frequently presented to the ER with complaints of pain. Tr. at 437.

Plaintiff visited Moncks Corner Medical Center's ER on November 9, 2010, with a complaint of chronic neck pain. Tr. at 441. The provider noted no abnormalities on physical examination and wrote "PT HERE VEY FRQUENTLY FOR VARIOUS PAIN COMPLAINTS." Tr. at 442. The provider's clinical impressions were acute myofascial strain and neck pain. Tr. at 443. He instructed Plaintiff to apply ice, to take acetaminophen, and to follow up with her doctor in three days. *Id.*

On December 12, 2010, Plaintiff presented to the ER at Moncks Corner Medical Center after she closed her left hand and wrist in her car door. Tr. at 446. The provider observed Plaintiff to have moderate left wrist tenderness, limited ROM, mild swelling, and medium-sized ecchymosis. Tr. at 447. X-rays of Plaintiff's left wrist and hand were negative. *Id.* The provider applied a splint and sling and recommended Plaintiff follow up with another provider within five days. *Id.*

Plaintiff presented to the ER at Moncks Corner Medical Center after dropping an object on her left foot and sustaining an injury. Tr. at 451. The provider observed Plaintiff to have moderate tenderness, mild swelling, and medium-sized ecchymosis of the middle and distal aspect of the dorsal foot and noted her ROM was limited by pain. Tr. at 452. The provider diagnosed a contusion with a soft tissue hematoma. *Id.*

On April 2, 2011, Plaintiff presented to Moncks Corner Medical Center, with complaints of back pain. Tr. at 456. She indicated she developed the pain after lifting boxes. *Id.* Plaintiff left the ER without treatment because she received a call indicating her daughter had fallen from a tree. Tr. at 458.

Plaintiff presented to the ER at Trident Medical Center on April 9, 2011, after crushing her left hand in her car door. Tr. at 474–75. The provider observed Plaintiff to have mild tenderness and swelling and large ecchymosis of the central aspect of the dorsal hand. Tr. at 475. The provider instructed Plaintiff to apply ice intermittently, to elevate her hand above chest level, and to follow up with her doctor, as needed. Tr. at 475. He prescribed Lortab for pain. *Id.*

On March 2, 2012, state agency consultant Judith Von, Ph. D. ("Dr. Von"), reviewed the record and completed a psychiatric review technique. Tr. at 51–52. She considered Listing 12.06 for anxiety-related disorders, but found that the record contained insufficient evidence to assess whether Plaintiff met paragraph "B" criteria under the Listing. Tr. at 51. Dr. Von indicated the evidence in the file was insufficient to determine the severity of Plaintiff's impairment at her date last insured ("DLI"). Tr. at 52. Michael Neboschick, Ph. D., reached the same conclusion on May 18, 2012. Tr. at 62–63.

State agency medical consultant Jean Smolka, M.D., reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment on March 5, 2012. Tr. at 52–55. She indicated Plaintiff could occasionally lift and/or carry 10 pounds; could frequently lift and/or carry less than 10 pounds; could stand and/or walk for a total of two hours during an eight-hour workday; could sit for about six hours in an eight-hour workday; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, and scaffolds; and should avoid all exposure to hazards. *Id.* S. Farkas, M.D., assessed the same RFC on May 16, 2012. Tr. at 64–67.

Plaintiff was admitted to Trident Medical Center from October 15 to October 17, 2012, for shortness of breath with mild exertion and intermittent chest discomfort. Tr. at 752. Barbara Magera, M.D., indicated Plaintiff had previously presented to the ER at Moncks Corner Medical Center, where her blood pressure was markedly elevated. Tr. at 754. Tina Botelho, M.D., provided final diagnoses of noncardiac chest pain, shortness of breath, severe hypertension, hypokalemia, diarrhea, and possible gastritis. Tr. at 755.

Plaintiff presented to Trident Health Systems on December 8, 2012, and indicated she had injured her neck while running on her treadmill. Tr. at 778. The provider noted tenderness in Plaintiff's neck. Tr. at 779. Richard Wendell, M.D., diagnosed a neck sprain and prescribed pain medication and a muscle relaxant. Tr. at 780.

On January 30, 2013, Plaintiff presented to the ER at Trident Health Systems with complaints of high blood pressure and headaches. Tr. at 742. She indicated she had stopped taking her blood pressure medication a month earlier because she was unable to afford it. Tr. at 742. She indicated she had experienced tingling in her bilateral hands and mild chest pain. *Id.* The provider diagnosed essential hypertension and prescribed medications. Tr. at 746.

On June 28, 2013, Plaintiff presented to Francis J. Fishburne, Ph. D. ("Dr. Fishburne"), for psychological testing. Tr. at 782–85. She indicated she spent a typical day caring for her son, performing household chores, watching television, and talking on the phone. Tr. at 783. She stated she was limited by panic attacks and short-term memory deficits. *Id.* She indicated she had a driver's license and drove to the appointment. *Id.* She reported three to four nightmares per week and stated she had difficulty falling asleep. *Id.*

She complained of depression that resulted in crying and locking herself in her house. *Id.*
She endorsed difficulty interacting with visitors and being in crowds. *Id.* She indicated
she had difficulty concentrating to complete tasks. *Id.* She endorsed problems with her
memory. *Id.* Dr. Fishburne noted Plaintiff was able to understand and follow simple
instructions without difficulty. *Id.* Dr. Fishburne indicated Plaintiff was adequately
groomed and oriented in all spheres. *Id.* He stated Plaintiff's mood appeared depressed
and that she frequently cried. *Id.* He noted Plaintiff demonstrated no evidence of
delusions, hallucinations, or paranoid thinking and was cooperative. *Id.* He stated the
results of his testing were judged to be an accurate reflection of Plaintiff's current level of
functioning. *Id.* Dr. Fishburne assessed Plaintiff's full-scale IQ score to be 66. Tr. at 784.
He indicated that he had 95 percent confidence that Plaintiff's IQ fell in the range from
64 to 72. *Id.* Plaintiff's short-term and general memory fell within the borderline range of
abilities. Tr. at 784. Plaintiff's language-related academic achievement scores fell in the
low-average to average range and her math computation scores fell in the mildly-
impaired range. Tr. at 785. Dr. Fishburne's diagnostic impressions were cognitive
disorder, secondary to anoxia; panic disorder; depression, secondary to medical
condition; and opioid abuse versus dependence. *Id.* Dr. Fishburne opined that Plaintiff
could not manage benefits in her own best interest because of a history of Hydrocodone
abuse. Tr. at 787. He also completed a medical source statement. Tr. at 788–89. He
indicated Plaintiff had no restriction on her abilities to understand and remember simple
instructions, carry out simple instructions, and make judgments on simple work-related
decisions. Tr. at 788. He stated Plaintiff had moderate limitations in her abilities to

understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions. *Id.* He wrote "Ms. Webb's intellectual capacity as currently measured is substantially and significantly below expectation given her history as a paralegal." *Id.* Dr. Fishburne indicated Plaintiff had moderate limitation in her ability to interact appropriately with the public, but only mild limitation in her abilities to interact appropriately with supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. Tr. at 789. He noted that Plaintiff had significant symptoms of depression and panic and that a full neuropsychological evaluation would be helpful to determine if any other capabilities were affected by Plaintiff's impairment. *Id.*

    C.      The Administrative Proceedings

        1.      The Administrative Hearing

            a.      Plaintiff's Testimony

At the hearing on May 15, 2013, Plaintiff testified that she was in a coma during the first five days of her hospitalization in 2009. Tr. at 29. She stated that when she awoke, she was unable to remember her children's names or any events from the two months leading up to her hospitalization. *Id.* She indicated she had to be retaught how to perform tasks like washing her hair. *Id.* She stated she began to remember some things over time, but that she never remembered having given birth to her youngest child. Tr. at 29–30.

Plaintiff testified she had difficulty forming new memories and that she frequently relied upon sticky notes to remind her of things. Tr. at 30–31. She stated she continued to

take blood pressure medication and to have regular EKGs, but that she had generally recovered from a physical standpoint. Tr. at 31.

Plaintiff testified that she had worked as a paralegal and an office manager in a law firm. Tr. at 31–32. She indicated she would be unable to perform any job that would require she remember things. Tr. at 32.

Plaintiff testified she did not leave her house for the first three years after her hospitalization. *Id.* She endorsed some difficulty sleeping. Tr. at 32–33. She indicated she sometimes became lost when traveling to familiar locations. Tr. at 33. Plaintiff stated she spent most of her days inside her home and walking around her neighborhood with her son. Tr. at 34. She denied attending her children's school functions. Tr. at 35.

Plaintiff indicated she had a very helpful family support system, which included her three daughters, her mother, and her husband. Tr. at 33. She stated her family members managed her finances and transported her to her children's doctors' appointments. *Id.* She indicated her 12-year-old daughter had moved in with her mother and her older daughter because she had difficulty transporting her to activities. Tr. at 34.

Plaintiff testified she had no medical insurance and that her family lived from week-to-week on her husband's pay. Tr. at 33. She indicated she was unable to afford medical treatment. *Id.*

The ALJ asked Plaintiff why she had informed her doctors that she was doing okay and that her memory was fine. Tr. at 35. Plaintiff stated that she was using alcohol and hydrocodone to ease the stress in her life at that time. *Id.* She indicated she had

entered a rehabilitation facility the previous July and had overcome her substance abuse problems. *Id.*

### b.    Witness Testimony

Plaintiff's husband David Darrow ("Mr. Darrow") testified at the hearing. Tr. at 37–41. He indicated he was first married to Plaintiff when she was 16 years old, but that they separated for 15 years. Tr. at 37. He stated they remarried approximately 10 years ago. *Id.*

Mr. Darrow testified Plaintiff was very withdrawn and did not desire to leave her home. *Id.* He stated that when Plaintiff left the house, she traveled only to one location and immediately returned home. Tr. at 37–38. He indicated Plaintiff did not react well in social situations and had even left a party at her home once the guests began to arrive. Tr. at 38. He stated Plaintiff panicked when he mentioned visiting a restaurant. Tr. at 40. Mr. Darrow testified Plaintiff frequently repeated things. *Id.* He stated he had to administer Plaintiff's medications because she had both forgotten to take her medication and overmedicated in the past. Tr. at 39.

Mr. Darrow testified that he cooked and shopped for groceries. Tr. at 40. He stated that Plaintiff sometimes attempted to cook, but that she became upset when she did not prepare the food correctly. *Id.* He indicated Plaintiff felt comfortable in her mother's home and often stayed over on two or three nights per week. *Id.*

### c.    Vocational Expert Testimony

Vocational Expert ("VE") Jody Doherty reviewed the record and testified at the hearing. Tr. at 42–44. The VE categorized Plaintiff's PRW as a secretary, *Dictionary of*

14

*Occupational Titles* ("*DOT*") number 203.582-058, as sedentary with a specific vocational preparation ("SVP") of five; an administrative assistant, *DOT* number 219.362-010, as light with an SVP of four; and a paralegal, *DOT* number 119.267-026, as light with an SVP of seven. Tr. at 42–43. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work; could not climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; must avoid working at unprotected heights; and was limited to simple, routine, repetitive tasks in an environment free of interaction with the general public. Tr. at 43. The VE testified that the hypothetical individual could perform sedentary, unskilled jobs as a document preparer, *DOT* number 249.587-018, with 1,117 positions in South Carolina and 98,000 positions in the national economy; an inspector, *DOT* number 669.687-014, with 912 positions in South Carolina and 58,000 positions in the national economy; and a label printer, *DOT* number 585.685-062, with 963 positions in South Carolina and 54,000 positions in the national economy. Tr. at 43–44. The ALJ asked the VE to further assume that the individual did not have sufficient attention or concentration to perform even unskilled work for a full eight-hour workday or 40-hour workweek. Tr. at 44. The VE indicated there would be no jobs the individual could perform. *Id.*

2.      The ALJ's Findings

In his decision dated August 9, 2013, the ALJ made the following findings of fact and conclusions of law:

1.      The claimant last met the insured status requirements of the Social Security Act on December 31, 2009.

15

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2009 through her date last insured of December 31, 2009 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: post-partum cardiomyopathy and cardiac arrest with anoxic brain injury, PTSD, anxiety, depression, hypertension, and headaches (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work except that she could not climb ladders, ropes, or scaffolds; she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; she needed to avoid working at unprotected heights; and she was limited to simple, routine, repetitive tasks in an environment where there is no interaction with the general public.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on April 30, 1967 and was 42 years old, which is defined as a younger individual age 18–44, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from April 1, 2009, the alleged onset date, through December 31, 2009, the date last insured.

Tr. at 13–19.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ's Listings analysis is not supported by substantial evidence; and

2)    the ALJ did not properly assess Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Listings Analysis

Plaintiff argues the ALJ did not adequately consider whether her impairments met or were functionally equal to Listings 12.04 and 12.06. [ECF No. 13 at 9]. She maintains the ALJ did not properly consider the Listings paragraph "B" criteria in light of the evidence of record. *Id.* at 9–10. She contends the ALJ failed to consider Listing 12.02, which was most relevant to her condition, particularly in light of Dr. Fishburne's assessment. *Id.* at 10. Finally, she argues that because she met some of the criteria of multiple Listings, the ALJ should have found that her impairments were of equal medical significance to a Listed impairment. *Id.* at 12.

The Commissioner argues the ALJ properly concluded that Plaintiff's mental impairments did not meet the paragraph "B" criteria for any of the mental disorders under Listing 12.00. [ECF No. 15 at 9]. She maintains Dr. Fishburne's observations did not

pertain to Plaintiff's level of functioning prior to her DLI of December 31, 2009, because treatment notes evidencing her pre-DLI condition existed in the record. *Id.* at 10–12. She contends that even if Dr. Fishburne's examination reflected Plaintiff's level of functioning prior to her DLI, it still showed that she was not disabled. *Id.* at 12.

"In evaluating a claimant's impairment, an ALJ must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000), citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986) (remanded, in part, because of ALJ's failure to specifically identify relevant Listing and compare each of the Listed criteria to the evidence of the claimant's symptoms). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* "In order to meet a Listing, every element of the listing must be satisfied." *Id., citing Sullivan v. Zebley*, 493 U.S 521, 531 (1990).

The Listings relevant to the court's analysis are Listings 12.02, 12.04, and 12.06. The introduction to Listing 12.00 for mental disorders provides that "[t]he evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitations such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(a); *see also* 20 C.F.R. § 404.1525(c)(2) ("The introduction to each body system contains information relevant to

the use of the listings in that body system . . .”). To satisfy Listings 12.02, 12.04, and 12.06, the individual's impairment(s) must satisfy the diagnostic criteria in the introductory paragraph and the criteria of both paragraphs A and B or A and C. *Id.* The Commissioner concedes that Plaintiff's impairments meet the requirements of the introductory paragraph and paragraph "A" for Listings 12.02, 12.04, and 12.06. *See* ECF No. 15 at 13 n.4.

The ALJ found that through Plaintiff's DLI, she had no impairment or combination of impairments that met or medically-equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. at 14. He found that the severity of Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of Listings 12.04 and 12.06. *Id.* The ALJ explained that he reached his findings after considering whether Plaintiff met the paragraph "B" criteria under the Listings. *Id.* He determined Plaintiff did not have marked restriction in any of the areas assessed under paragraph "B." *Id.* He assessed Plaintiff to have moderate restriction in activities of daily living and explained that while Plaintiff testified that she mainly stayed at home for the two years after her cardiac arrest, treatment notes documented that by January 2010, she was able to independently care for her baby, drive, and perform household chores. *Id.* The ALJ assessed Plaintiff to have moderate difficulties in maintaining social functioning based on her testimony that she did not leave her home for two years after her alleged onset date and her husband's testimony that she avoided social situations. *Id.* He assessed Plaintiff to have moderate difficulties with regard to concentration, persistence, or pace. *Id.* He noted that, although

Plaintiff alleged ongoing problems with concentration and memory during the relevant period, a treatment note from April 2009 stated Plaintiff was doing fairly well with her executive memory and a treatment note from May 2009 indicated her cognitive functioning was improving, as well. *Id.* Finally, the ALJ indicated Plaintiff had experienced no periods of decompensation that were of extended duration. *Id.* He explained that because Plaintiff's mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration, the paragraph "B" criteria were not satisfied. *Id.* He noted that he had considered the paragraph "C" criteria, but that the evidence failed to establish its presence. *Id.* He later stated the following: "I have considered the combined effects of the claimant's impairments and have determined that the findings related to them are not at least equal in severity to those described in Listings 1.00, 4.00, 11.00 or 12.00." Tr. at 15.

Plaintiff argues that the ALJ erred in failing to consider Dr. Fishburne's findings because they suggested that she had more than moderate restriction in social functioning and concentration, persistence, and pace and indicated a finding of disability under Listing 12.02. [ECF No. 15 at 9–12]. The Commissioner argues that Dr. Fishburne's report was irrelevant to Plaintiff's functioning prior to her DLI and should not have been considered. "[T]he principles of agency law limit this Court's ability to affirm based on *post hoc* rationalizations by the Commissioner's lawyers." *Robinson ex rel. M. R. v. Comm'r of Soc. Sec.*, No. 0:07-3521-GRA, 2009 WL 708267, at *12 (D.S.C. 2009). "[R]egardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the

grounds for [his] decision and confine our review to the reasons supplied by the ALJ." *Id.*, citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). However, the Fourth Circuit has generally found an ALJ's error to be harmless where he "conducted the proper analysis in a comprehensive fashion," "cited substantial evidence to support his finding," and would have unquestionably "reached the same result notwithstanding his initial error." *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994).

Although Dr. Fishburne's report was included in the record before the ALJ's decision (Tr. at 23), the ALJ made no specific mention of Dr. Fishburne's findings. *See* Tr. at 13–19. However, he noted the following: "I have given limited weight to the claimant's medical records following her date last insured of December 31, 2009, as they are less relevant to the claimant's claim for disability the more chronologically distant they are from the claimant's date last insured." Tr. at 15. While the ALJ did not specify that he gave limited weight to Dr. Fishburne's particular findings, he indicated that he accorded limited weight to all the records following Plaintiff's DLI. *See id.* Dr. Fishburne examined Plaintiff in June 2013, approximately three-and-a-half years after her DLI. *See* Tr. at 782. Thus, based on the ALJ's explanation, the court can logically follow that he gave limited weight to Dr. Fishburne's examination—even though he did not specifically discuss it.

Even if the court were to find that the ALJ erred by not specifically discussing Dr. Fishburne's findings, Plaintiff has failed to show that she was harmed by the error. *See King v. Colvin*, No. 9:13-1963-MGL, 2015 WL 337644, at *2 (D.S.C. Jan. 26, 2015), citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an

error is harmful normally falls upon the party attacking the agency's determination."). To satisfy the requirements of paragraph "B," the individual's impairment must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 12.02(b), 12.04(b), 12.06(b). The ALJ considered the paragraph "B" criteria under Listings 12.04 and 12.06 and cited substantial evidence to support his conclusions that Plaintiff had moderate difficulties in activities of daily living, social functioning and concentration, persistence, and pace. *See* Tr. at 14. Contrary to Plaintiff's assertion, Dr. Fishburne's medical source statement is consistent with the ALJ's conclusions. *See* Tr. at 788–89 (Dr. Fishburne found that Plaintiff had no limitations in her abilities to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions; only moderate limitations in her abilities to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions; only moderate limitation in her ability to interact appropriately with the public; and only mild limitations in her abilities to interact appropriately with supervisors and co-workers and to respond appropriately to usual work situations and changes in a routine work setting.). Thus, Plaintiff's reliance on Dr. Fishburne's report to suggest her impairments met the paragraph "B" criteria is erroneous.

Plaintiff's reliance on Dr. Fishburne's report to suggest she met Listing 12.02 is similarly unpersuasive. The undersigned notes that Dr. Fishburne's report suggested

Plaintiff's impairment satisfied the requirements in the introductory paragraph and paragraph "A" of Listing 12.02, but not paragraphs "B" or "C." *Compare* Tr. at 782–85, 788–89, *with* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02. An individual cannot meet the requirements of the Listing without satisfying the criteria in the introductory paragraph, paragraph "A," and either paragraph "B" or "C." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(a). The ALJ found that Plaintiff did not meet the paragraph "B" and "C" criteria under Listings 12.04 and 12.06, which are the same as for Listing 12.02. *See* Tr. at 14 (concluding that neither the paragraph "B," nor the paragraph "C" criteria were satisfied under Listings 12.04 and 12.06); *compare* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02(b), (c), *with* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 12.04(b), (c), 12.06(b), (c). An ALJ is only required to fully analyze whether a claimant's impairment meets or equals a Listing where the evidence suggests that the Listing could be met, but Dr. Fishburne's opinion does not suggest Listing 12.02 could be met because it indicates Plaintiff's impairment did not satisfy the paragraph "B" or "C" criteria. *See* Tr. at 788–89; *cf. Huntington*, 101 F. Supp. 2d at 390. Having determined Plaintiff's impairment did not satisfy the requirements of paragraph "B" or "C" under Listings 12.04 and 12.06, it was unnecessary for the ALJ to specifically consider the introductory paragraph or paragraph "A" of Listing 12.02. *See Mickles*, 29 F.3d at 921. Therefore, the ALJ did not err in neglecting to specifically consider the Listing.

Plaintiff argues that she met the criteria of various Listings and that the ALJ should have found that her combination of impairments equaled a Listing. [ECF No. 13 at 12]. Pursuant to 20 C.F.R. § 404.1526(a), an impairment is medically-equivalent to an

impairment in the Listings if it is at least equal in severity and duration to the criteria of any Listing. Medical equivalency to an impairment described in the Listings can be demonstrated in one of the following ways: (1) if the individual has an impairment described in a Listing, but does not exhibit one or more of the specified findings in the particular Listing; (2) if the individual has an impairment described in the Listings, and exhibits all the findings in the Listing, but one or more of the findings is not as severe as specified in the Listing; or (3) if the individual has other findings related to her impairment that are at least of equal medical significance to the required criteria. 20 C.F.R. § 404.1526(b)(1). Listing 12.00 further elucidates the consideration of medical equivalency and provides that the determination is based upon the presence of "impairment-related functional limitations that are incompatible with the ability to do any gainful activity." *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(a). It further states the following:

> The listings are so constructed that an individual with an impairment(s) that meets or is equivalent in severity to the criteria of a listing could not reasonably be expected to do any gainful activity. These listings are only examples of common mental disorders that are considered severe enough to prevent an individual from doing any gainful activity. When you have a medically determinable severe mental impairment that does not satisfy the diagnostic description of the requirements of the paragraph A criteria of the relevant listing, the assessment of the paragraph B and C criteria is critical to a determination of equivalence.

*Id.* Thus, for an individual's mental impairment to equal a Listing under Listing 12.00, she must meet the criteria in either paragraph "B" or "C."

Plaintiff argues the ALJ's discussion of the paragraph "B" criteria did not demonstrate that her impairments were not equivalent in severity to a Listing, but she

cites no evidence to show that she met the requirements of paragraph "C." Paragraph "C" requires a medically-documented history of a chronic mental disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 12.02(c), 12.04(c), 12.06(c). The ALJ indicated he had "considered whether the 'paragraph C' criteria were satisfied," but concluded that "the evidence fails to establish the presence of the 'paragraph C' criteria." Tr. at 14. He also noted that the record did not document specific treatment for PTSD or depression during the relevant period. Tr. at 16. "Plaintiff bears both the burden of production and the burden of proof that she is disabled under the Act." *King*, 2015 WL 337644, at *2, citing *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). Because Plaintiff makes no specific argument to suggest she met the requirements of paragraph "C," and because the record demonstrates that her symptoms were not treated with medication or psychosocial support, which is a requirement under paragraph "C," the undersigned finds that the ALJ did not err in concluding that the evidence failed to establish the presence of paragraph "C" criteria. *See King*, 2015 WL 337644, at *2 ("First, the ALJ's failure to give more explanation for

his decision that Plaintiff's impairment alone did not equal the severity of Listing 11.03 is not reversible error where, as here, it is clear from the record that his having written more would have had no effect on the outcome of the case."). Thus, substantial evidence supports the ALJ's determination that Plaintiff's impairments did not meet the criteria in paragraphs "B" and "C" of Listings 12.02, 12.04, and 12.06, and the ALJ rationally concluded that Plaintiff's impairment or combination of impairments did not equal a Listing.

In light of the foregoing, the undersigned recommends the court find that substantial evidence supports the ALJ's consideration of the Listings.

### 2.     RFC Assessment

Plaintiff argues the ALJ's RFC assessment failed to adequately account for all of her severe and non-severe impairments. [ECF No. 13 at 13]. She specifically maintains the ALJ did not explain how the RFC accommodated her moderate difficulty in concentration, persistence, or pace. *Id.*

The Commissioner argues the ALJ accounted for Plaintiff's moderate memory and concentration difficulties by limiting her to simple, routine, and repetitive tasks. [ECF No. 15 at 13]. She maintains Dr. Fishburne's medical source statement is consistent with the RFC assessed by the ALJ. *Id.* She contends the ALJ's RFC assessment is distinguishable from that found to be flawed in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), because in *Mascio*, the ALJ limited the plaintiff to unskilled work based on moderate limitations in concentration, persistence, and pace, but here, the ALJ limited Plaintiff to simple, routine, and repetitive tasks. *Id.* at 14.

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by her impairments and determine her work-related abilities on a function-by-function basis. SSR 96-8p. This typically requires that the ALJ consider the claimant's ability to sustain work-related activities over an eight hour day and five-day work week or an equivalent work schedule. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* Relevant evidence includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations, if available. *Id.* The Fourth Circuit recently held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found that Plaintiff had the RFC to perform sedentary work that did not require climbing of ladders, ropes, or scaffolds or work at unprotected heights; that only occasionally required climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and that involved simple, routine, repetitive tasks in an

environment free of interaction with the general public. Tr. at 15. In assessing Plaintiff's RFC, the ALJ considered her history of cardiac arrest and anoxic brain injury. Tr. at 16. He noted that Dr. Dacus indicated Plaintiff was doing very well with her executive memory in April 2009. *Id.* He indicated that in May 2009, Dr. Taylor noted Plaintiff's cognitive and motor functioning were improving well and that she had made a good neurologic recovery. *Id.* He recognized that Dr. Dacus noted that Plaintiff had made remarkable improvement and was able to care for her child in January 2010. *Id.* He noted that Plaintiff received no treatment for depression or PTSD prior to her DLI of December 31, 2009. *Id.* The ALJ acknowledged that Plaintiff was diagnosed with depression in February 2010 and that medication management and therapy were suggested at that time, but that Plaintiff never pursued those options. *Id.*

The undersigned finds the ALJ's consideration of Plaintiff's RFC in this case to be distinguishable from that found to be insufficient in *Mascio*. In *Mascio*, the court found that the ALJ erred in determining the plaintiff's RFC based on an incomplete hypothetical to the VE. 780 F.3d at 637. Despite the fact that the ALJ had included adjustment disorder among the plaintiff's severe impairments, he included no mental limitations in the hypothetical question to the VE. *Id.* The court determined that the ALJ's finding that the plaintiff was limited to unskilled work was based on the VE's "unsolicited addition of 'unskilled work'" in response to the ALJ's hypothetical. *Id.* at 637–38. Here, the ALJ included in his hypothetical question to the VE mental limitations to the performance of simple, routine, repetitive tasks in an environment free of interaction with the general public. *See* Tr. at 43. The ALJ incorporated the same

restrictions in his assessment of Plaintiff's RFC and found that she could perform the jobs identified by the VE in response to the hypothetical question. *See* Tr. at 17, 18–19. Thus, in contrast to the RFC in *Mascio*, the RFC assessed by the ALJ in this case matched the hypothetical posed to the VE, and both the hypothetical and the assessed RFC addressed Plaintiff's mental limitations.

Plaintiff also argues the mental limitations assessed by the ALJ do not adequately account for her moderate limitation in concentration, persistence, or pace. [ECF No. 13 at 13]. In *Mascio*, the court stated "we agree with other circuits that an ALJ does not account "for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." 780 F.3d at 638. The court further explained that "the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work . . . [b]ut because the ALJ here gave no explanation, a remand is in order." *Id.* The ALJ's consideration of Plaintiff's RFC in the instant case differs from the ALJ's consideration in *Mascio* in two important ways. First, the ALJ not only limited Plaintiff to simple, routine tasks, he also restricted her to repetitive tasks. *See* Tr. at 17. A limitation to repetitive tasks removes the need to transition from one task to another, which would likely disrupt an individual's concentration. Second, unlike the ALJ in *Mascio*, this ALJ explained that he had "considered the reports of avoidance of social situations, a desire not to leave her home, and difficulty with memory and concentration in limiting her to simple, routine, tasks in an environment which does not require interaction with the general public." *See* Tr. at 17; *see also Gilbert v. Colvin*, No. 2:14-981-MGL-MGB, 2015 WL 5009225, at *14 ("In the

case *sub judice*, however, the ALJ limited Plaintiff to 'simple work,' specifically relying on Dr. Boland's assessment that despite Plaintiff's 'difficulty sustaining her concentration and pace on complex tasks,' Plaintiff 'should be able to . . . perform simple tasks without special supervision.'"). While *Mascio* provides that "the ability to perform simple tasks differs from the ability to stay on task," the ALJ did not specifically find that Plaintiff lacked the ability to stay on task. Instead he found that Plaintiff's moderate impairment to memory and concentration could be accommodated by limiting her to a work environment that required she perform simple, routine, and repetitive tasks. While Plaintiff alleges that "almost all of" her "complaints go to the issue of persistence," [ECF No. 13 at 13], the undersigned notes that the ALJ considered Plaintiff's complaints, but found that they were not entirely credible based on her medical reports and daily activities detailed in the medical record. *See* Tr. at 17 ("While I do not find that the subjective reports of the claimant or her husband are fully credible regarding the claimant's limited ability to function during the relevant period, I have given her the benefit of the doubt in limiting the amount she can sit, stand, walk, lift, carry, climb, balance, stoop, kneel, crouch, crawl, and work around unprotected heights. While there is no clear diagnosis of PTSD or depression during the relevant period, I have considered the reports of avoidance of social situations, a desire not to leave her home, and difficulty with memory and concentration in limiting her to simple, routine, tasks in an environment which does not require interaction with the general public."). Because the RFC assessed by the ALJ reflects adequate consideration of the relevant evidence and the

effects of Plaintiff's impairments on her functional abilities, the undersigned recommends the court find it to be supported by substantial evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

December 9, 2015                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).